Good morning ladies and gentlemen. We have four cases on our calendar this morning, patent case from the district court, banking case, I guess there's a difference of opinion as to whether it's a tax case, federal claims, two government employee cases, neither of which will be argued, they're being submitted on the briefs. So the first case is Digital Impact v. Bigfoot Interactiv, 2008-12-55, Mr. Moore. Thank you, your honor. May it please the court, I'm Tom Moore, I'm here representing the appellant and plaintiff in this case, Digital Impact. This case is on appeal from the grant of summary judgment of non-infringement that was entered on behalf of the defendant in this case, Bigfoot. My client's invention is an email sensor technique that is used to track emails. At the district court level we submitted evidence to the court that the defendant in the case of Bigfoot uses the email sensor technique in exactly the way specified in the specification to our patent, and that the defendant Bigfoot does in fact track responses to the emails it sends. Your problem is the definition of joint infringement, isn't it? That is exactly right, your honor. How does your fact situation differ from BMC? It differs in three different ways. First, it differs in the sense that in BMC the alleged infringer in that case performed the first two or three steps of the claimed process. The remaining steps were performed by either debit processing institutions or financial institutions, who were clearly separate. They had total control of administration over their own computer systems. So first, that was a case in which the accused infringer began the process but did not complete it. In our case, this is a situation where the accused infringer both begins the process and completes the process. The intermediate steps are performed separately via email client software over which there are defined protocols. But is there any control over those intermediate steps? The control is found by virtue of the protocols, standards, and programming languages that link email together. It is a matter of those protocols by which an email that is formatted in a particular way and is sent to a separate email client, to an address, will have an effect at that email client. For example, the email client will say, your mail has arrived. That is a level of control that does take place. But although the client may receive it, the client is not obligated to open it. Is that a required step? It is a required step. In order to process and display said image? That's right, Your Honor. Opening is a required step. You mean a required step by the claim? By the claim, that's right. Step two states... Step three, right. Receiving and opening is step two. Is step two. Step three is display the image. I'm looking up in the air because to the extent I recall, step three is the determining step. Step four is sending a response. Step five is receiving. Step six is then storing in a database. And it's up to the receiver whether to carry out those steps. It is the email client, which is software, that carries out the intermediate steps of two, three, and four. That is correct. So the initiation by the plaintiff here does not necessarily result in all of the steps being carried out by anyone. But if they are carried out, it's at the instance of the initiator. If they are carried out, it is at the instance of the initiator. That is correct. Wasn't that true in BMC? Wasn't that true in BMC? No, Your Honor. And the reason it was not true is because there was no evidence in the case of any instructions that were given by the initiator to the financial institutions. There was nothing in the record, at least as far as I am aware of, beyond the sending of data from the initiator to the financial institutions. There was no evidence of connections or protocols that would permit the instigator to utilize what is essentially a distributed system. But in each case, you have an invention that involves the action of several parties. And you say there weren't any instructions. Well, they had to have been instructed. They knew what was going on. They were parties to the process. And the question is, is this any different? The answer is yes, Your Honor. And part of the difference is the presence in this record of the protocols, the presence in this record of emails acting in a way that controls disparate computers by virtue of the protocols. What exactly do you mean when you say that? I'm sorry for interrupting, but the word has come up a couple of times, and you're now responding to Judge Lurie's question. What do you mean when you say protocols? What exactly when you say it? I mean, you seem to put a lot of importance on that term here and say that that's the hook for you that shows, in essence, control. What do you mean by protocols? Protocols. Protocols are standards. They are an agreed-upon way of formatting emails, of formatting the data within emails, that permit the interoperability of email as a distributed system. That is what makes an email sent from my computer, which uses Outlook, which is proprietary software to Microsoft, and can be received on a disparate computer or a PDA or a variety of other things that is actually running different things. That's helpful to me, but how does that get you to the control element that seems to be important as a matter of law? Because of these protocols, there are email clients, and this is within the way the patent was construed by the district court, there are email clients that will process, that will open and process the image, the image tag that is at the heart of our invention, and do it automatically. So to the extent that all of this is done automatically without any human involvement at all, that in and of itself is a ground to reverse judgment. Suppose someone logs off their computer and they leave the office at the end of the day, and an email comes in, one of these emails that's at issue comes in from Bigfoot, right? Yes, sir. And what happens then if the computer is turned off? You're saying that nevertheless, via the operation of these protocols, some kind of an action will take place on the part of the client, and that's the term I guess for the computer, that will send a message back to Bigfoot? With the computer turned off? No, Your Honor, not with the computer turned off. That will happen when the computer is turned back on. Okay. The way the steps of the patent are set out, it takes for granted that it's described in terms of what the email client does, and there's no reference to a human being in terms of those steps. So it does posit that the email client is up and running. But yes, the entire process can be done in an automated fashion, steps one through six. But how is the opening automatic? Many email clients will open emails automatically. Some will, some won't. Some will, some won't. If, in fact, you have an opening, that's the determination of the recipient whether or not they're going to open it, isn't it? Not always. You could have some systems where the email comes in open. Is that what you're saying? That is what I'm saying, and that's what the record reflects, Your Honor. And that then is not within the control of the client. It's within the control of the sender, you're saying. Or is that within the control of the client? Effectively, yes. That is correct, Your Honor. That is correct. It is a matter of software working together, notwithstanding the fact that they're on separate computers. That is the nature of a distributed system. Now, if I may return to Judge Lorry very quickly, in terms of distinguishing BMC, there is evidence in this record of the accused infringer both beginning and ending the process. That's not true of BMC. There is evidence in this record of agreed-upon instructions and protocols, and that was not evident in BMC. The nature of the operation of the third parties who were not before the court was discretionary, highly discretionary, in the sense that they had complete control over their own computer systems, and in this case the human involvement is very discreet. And with that, if I may, I'll reserve the rest of my rebuttal. We will hold it for you, Mr. Moore. Thank you very much. Mr. Dresner. Good morning, Your Honor. Mr. Moore places great emphasis on technological status of communicating between senders and receivers and the equipment that senders and receivers use for opening e-mails. And Mr. Moore characterizes the claim as not requiring involvement of the user of the e-mail client, the computer with the software running on it. But, in fact, the construction of the claim at the district court as a matter of law does require human involvement to operate the e-mail client to receive and open the e-mail, and that is a required step of the claim. Without the human involvement, the e-mail cannot be opened, notwithstanding the fact that it's possible and frequently happens that a user will set up his computer in such a way that the software will automatically receive and open e-mails. That is merely an issue of the timing of when that user makes that decision. The user, the human user of the e-mail client is the person and the entity that makes the decision and exercises the step of receiving and opening the e-mail. Is this a BMC case? Excuse me? Is this a BMC case? This is a BMC case, and it's a muni-auction case, where we have steps performed by more than one entity. And, in this case, there's no issue that... Well, can there be no invention, then, consisting of steps being performed by multiple entities? Oh, absolutely, there can be an invention. The issue is that we have a claim that's poorly drafted, and the issue is whether or not there can be infringement of that claim. And, in fact, as the BMC court recognized, as between the patentee and the public at large, it's the patentee that should bear the burden for poorly drafted claims. And, in this particular situation, Digital Impact has had a continuation application issue at the United States Patent Office with claims... Well, how can you have a claim, a claim consisting of several steps, one of which involves the initiator of the email, the second of which involves a recipient opening it and doing something, and maybe that's a new and non-obvious process. Surely. But it's done by different parties. Isn't that joint infringement? That is joint infringement. And one of the parties could be liable for that joint infringement if they meet the standards... The one who initiated it, presumably. Yes, the person who initiates the email certainly could be liable for the actions of the other party if that sender, the initiator of the email, met the standards and the requirements in the Muni Auction case. Either they performed each and every step, but here we have multiple parties... Well, I'm hypothesizing that you have multiple parties... Yes. ...because part of the process involves an action by a recipient. Multiple parties. The issue, therefore, is whether or not the sender exercises control and direction over the recipient. But the sender set up, created the software such that if the recipient independently chooses to open it, it's because of what the sender built into the software. So, in a sense, the recipient is independent, but it's because the sender created the software that enabled the process to be completed. But the recipient has the choice of not opening. In which case there's no infringement. In which case there's no infringement. But if he does open, isn't that the completion of an infringement of a process? If the recipient has opened it, and if the recipient does that of his own choice, we do have, as you say, joint action, which results in each step of the claim taking place. That's not here? Well, it's not here because the sender doesn't control the activity of the recipient. But does the sender control, is responsible for the creation of the software, which, if the independent recipient utilizes, well, you say that is an independent act of the recipient, but it's because of what the creator built it in. But in this case, the sender has not created the software. The software is acquired by the recipient, independent of the sender. We buy our computers with Outlook built into it, that's supplied by Microsoft, independent of what the sender creates. The sender merely sends an email that is compatible with the software that the recipient has purchased and has placed on his computer. And that recipient can choose to set up that software so that it operates automatically or not. In either case, it's the choice of the recipient. And it's the recipient's act, not an act of software. Software is merely an instrumentality of the recipient. And in no way is it caused by an action of the sender? The receiving an opening is not caused by the sender. The sender has no control over whether or not his email is ever received and opened by the recipient. But if the opening constitutes a step in the patented process, is that not attributable to the sender? No, I don't believe it is attributable to the sender at all. It's attributable solely to the recipient. And is that not attributable to the sender because the sender did not create the software? That's correct. The sender did not create the software. The software was purchased independently by the recipient and it was set up independently on the recipient's email by the recipient. So it's an entirely independent act. Well, it would be correct to say, Mr. Judge, I guess, that the sender, Bigfoot, initiates the train of events that leads to a response coming back in that Bigfoot sends an email. But you're saying there's not the control there. Absolutely. And that's absolutely correct. The sender does initiate the events. And quite frankly, the sender hopes and expects that the recipient will receive, open the email, see the advertisement, buy the products, and respond to the sender. I mean, that's the expectation here. But the sender has no control over that, doesn't know whether it will ever happen, and has no agreement, no relationship with all of the receivers to control whether or not the recipient actually performs those acts. Mr. Dresden, how much control would be required at that point? Would it be an agency requirement? Would it be a direct control requirement? Well, certainly an agency requirement would give rise to the kind of vicarious liability that we would expect, and that the court in the Muni auction case spoke about. So an agency relationship, a contractual relationship, pursuant to which the recipient has somehow agreed to perform on behalf of the sender. But that's not what's happening here. There is no agreement. There's been no evidence in this case to suggest that there is any kind of vicarious liability whatsoever. The issue, quite frankly, here is, as Mr. Moore stated it, whether or not it's the software that performs the act, or whether it's really a person who exercises independent free will judgment. And I contend that it's the user of the software, the recipient who uses the software as a tool to receive and open his emails, and whether or not that recipient chooses to open the email either by using a mouse click to do it manually, or in advance has set up his computer to somehow do it automatically, it is nonetheless the act of the recipient. And I think that's where we differ. Thank you very much. Thank you, Mr. Dresner. Mr. Moore, you have some time. Mr. Dresner and I agree on what the essential issues are. It's an interesting case in that sense that he says there has to be some human involvement somewhere, and that as a consequence of that human involvement, his client cannot be held to infringe. I say, in essence, that there is still evidence in the record from which a jury could conclude that there is direction and control. First and foremost, by way of clarifying an issue, the District Courts Claim Construction Order does not actually say that the email recipient is the one who programs his own email client to open emails automatically. What the actual order says is that an email client is a computer or similar electronic device with software for receiving, processing, and displaying email messages. It is operated by a human user, which is what we're familiar with. The emails are there to be read. But it's operated by virtue of previously programmed software. And that previously programmed software allows it to operate automatically. So as the record reflects, in the declaration of my expert witness, the entire process can be done automatically. Mr. Dresner points, of course, and everyone is most familiar with the situation in which a human being opens their email. Certainly I open my email. That is the way my email client operates. Not all of them do that way, but that's the way mine does. I believe that it is the procedural posture of this case that actually should direct a decision. This case is here on summary judgment. It is a situation in which, as the non-moving party, the plaintiff is entitled to all inferences. The thing that I find most unusual about this case, and it's different from multi-auctions, it's different from BMC, and it's different from lower court cases that have addressed this, is that this is a situation in which the accused infringer both initiates a process and on this record also completes the process. It does step one, it does step fives and six. From that, a jury could reasonably infer that there is the necessary direction and control present in this particular case. The fact that there might be some discreet human involvement, human involvement in the sense of opening an email, and emails are sent to be opened and read, does not obviate a reasonable inference that Bigfoot does in fact direct and control the entire process. For that reason, we urge the court to reverse the district court's grant of summary judgment. Thank you very much. Thank you, Mr. Moore. We'll take the case under advisement.